# 19-4254(L), 20-31, 20-32, 20-41

**IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

| | | |
|---|---|---|
| STATE OF NEW YORK, CITY OF NEW YORK, STATE OF COLORADO, STATE OF CONNECTICUT, | : : : | On Appeal From the United States District Court for the Southern District of New York |

*(caption continued on inside cover)*

**AMICUS BRIEF OF OHIO, ALABAMA, ALASKA, ARIZONA, ARKANSAS, GEORGIA, KENTUCKY, LOUISIANA, MISSOURI, MONTANA, NEBRASKA, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, AND UTAH IN SUPPORT OF APPELLANTS AND REVERSAL**

DAVE YOST
Ohio Attorney General
ZACHERY KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980

BENJAMIN M. FLOWERS*
Ohio Solicitor General
　*Counsel of Record
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
bflowers@ohioattorneygeneral.gov

*Counsel for the State of Ohio*
*(Additional counsel listed after signature block)*

STATE OF DELAWARE, STATE OF            :
HAWAII, STATE OF ILLINOIS, STATE       :        District Court Case Nos.
OF MARYLAND, COMMONWEALTH              :        19-cv-4676, 19-cv-5433
OF MASSACHUSETTS, STATE OF             :        19-cv-5435
MICHIGAN, STATE OF MINNESOTA,          :
STATE OF NEVADA, STATE OF NEW          :
JERSEY, STATE OF NEW MEXICO,           :
STATE OF OREGON,                       :
COMMONWEALTH OF                        :
PENNSYLVANIA, STATE OF RHODE           :
ISLAND, STATE OF VERMONT,              :
COMMONWEALTH OF VIRGINIA,              :
STATE OF WISCONSIN, CITY OF            :
CHICAGO, COOK COUNTY, ILLINOIS,        :
*Plaintiffs-Appellees*                 :
                                       :
                                       :
PLANNED PARENTHOOD                     :
FEDERATION OF AMERICA, INC.,           :
PLANNED PARENTHOOD OF                  :
NORTHERN NEW ENGLAND, INC.,            :
NATIONAL FAMILY PLANNING AND           :
REPRODUCTIVE HEALTH                    :
ASSOCIATION, PUBLIC HEALTH             :
SOLUTIONS, INC.,                       :
    *Consolidated-Plaintiffs-Appellees*  :
                v.                     :
UNITED STATES DEPARTMENT OF            :
HEALTH AND HUMAN SERVICES,             :
ALEX M. AZAR, II, IN HIS OFFICIAL      :
CAPACITY AS SECRETARY OF THE           :
UNITED STATES DEPARTMENT OF            :
HEALTH AND HUMAN SERVICES,             :
UNITED STATES OF AMERICA,              :
    *Defendants-Appellants*            :
                                       :
                                       :

DR. REGINA FROST AND CHRISTIAN
MEDICAL AND DENTAL
ASSOCIATIONS.,

 *Intervenors-Defendants-*
 *Appellants*


ROGER T. SEVERINO, IN HIS
OFFICIAL CAPACITY AS DIRECTOR,
OFFICE FOR CIVIL RIGHTS, UNITED
STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, AND
OFFICE FOR CIVIL RIGHTS, UNITED
STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

 *Consolidated-Defendants-*
 *Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ii

INTRODUCTION AND STATEMENT OF *AMICI* INTEREST .......................1

ARGUMENT.....................................................................................3

   I.    The new regulations are consistent with this country's long history of
       protecting conscience. ..............................................................4

      A.    Since this country's founding, the States have protected individual
          beliefs, often more vigorously than federal law. ...................4

      B.    The District Court overlooked state conscience protections when
          it considered the potential impact of the new regulations. ................ 11

   II.   The District Court awarded overbroad relief that exceeded its judicial
       power...................................................................................... 16

CONCLUSION...................................................................................24

ADDITIONAL COUNSEL .................................................................26

CERTIFICATE OF COMPLIANCE....................................................27

CERTIFICATE OF SERVICE ............................................................28

i

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Hosp. Ass'n v. NLRB*,
    499 U.S. 606 (1991) ................................................................ 12

*Am. Legion v. Am. Humanist Ass'n*,
    139 S. Ct. 2067 (2019) .............................................................. 6

*Ariz. Christian Sch. Tuition Org. v. Winn*,
    563 U.S. 125 (2011) ................................................................ 17

*Boyle v. Zacharie*,
    31 U.S. 648 (1832) ................................................................. 18

*Brecht v. Abrahamson*,
    507 U.S. 619 (1993) ................................................................ 17

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ................................................................ 22

*Cenzon-DeCarlo v. Mount Sinai Hosp.*,
    626 F.3d 695 (2d Cir. 2010) ...................................................... 10

*City & Cty. of San Francisco v. Azar*,
    411 F. Supp. 3d 1001 (N.D. Cal. 2019) ........................................ 20

*City of New York v. Mickalis Pawn Shop, LLC*,
    645 F.3d 114 (2d Cir. 2011) ...................................................... 22

*Conway v. Taylor's Ex'r*,
    66 U.S. 603, 1 Black 603 (1861) ................................................ 19

*Dep't of Homeland Sec. v. New York*,
    140 S. Ct. 599 (2020) ...................................................... 3, 19, 20

*Employment Div. v. Smith*,
    494 U.S. 872 (1990) ................................................................. 6

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010) ................................................................ 18

*Grupo Mexicano De Desarrollo v. All. Bond Fund*,
　527 U.S. 308 (1999) .................................................................. 18

*Harlem Valley Transp. Ass'n v. Stafford*,
　500 F.2d 328 (2d Cir. 1974) ...................................................... 16

*Hecht Co. v. Bowles*,
　321 U.S. 321 (1944) .................................................................. 23

*Hellwege v. Tampa Family Health Ctrs.*,
　103 F. Supp. 3d 1303 (M.D. Fla. 2015) ...................................... 10

*Hobbie v. Unemployment Appeals Comm.*,
　480 U.S. 136 (1987) .................................................................... 5

*Holt v. Hobbs*,
　574 U.S. 352 (2015) .................................................................... 6

*Humphrey v. Lane*,
　89 Ohio St. 3d 62 (2000) ......................................................... 2, 7

*Johnson v. Acevedo*,
　572 F.3d 398 (7th Cir. 2009) .................................................... 13

*Lewis v. Casey*,
　518 U.S. 343 (1996) .................................................................. 17

*Nat'l Park Hospitality Ass'n v. DOI*,
　538 U.S. 803 (2003) .................................................................. 12

*New York v. United States HHS*,
　414 F. Supp. 3d 475 (S.D.N.Y. 2019) ................................. *passim*

*New York v. United States HHS*,
　414 F. Supp. 3d at 513–14, 536–39, 555–58 ........................ 14, 16

*Roe v. Wade*,
　410 U.S. 113 (1973) .................................................................... 8

*Rojas v. Martell*,
　2020 IL App (2d) 190215 ....................................................... 10, 11

*Sherbet v. Verner*,
374 U.S. 398 (1963) ..................................................................5

*Taylor v. St. Vincent's Hospital*,
369 F. Supp. 948 (D. Mont. 1973) .......................................8

*Trump v. Hawaii*,
138 S. Ct. 2392 ..............................................................18, 19, 20

*United Bhd. of Carpenters & Joiners v. Vincent*,
286 F.2d 127 (2d Cir. 1960) ...............................................16

*United States v. Seeger*,
380 U.S. 163 (1965) .............................................................7

*Va. Soc'y for Human Life, Inc. v. FEC*,
263 F.3d 379 (4th Cir. 2001) .............................................23

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) ...........................................................12

*Washington v. Azar*,
No. 2:19-cv-00183, 2019 U.S. Dist. LEXIS 203304 (E.D. Wash.
No. 21, 2019) ....................................................................20

*Welsh v. United States*,
398 U.S. 333 (1970) .............................................................7

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015) ...........................................................21

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) .............................................................5

**Statutes, Rules, and Constitutional Provisions**

U.S. Const. amend. I ..............................................................5

U.S. Const. art. III, §1 ...........................................................17

5 U.S.C. §706 ........................................................................23

42 U.S.C. §300a-7 ........................................................................8

42 U.S.C. §18113 .........................................................................8

83 Fed. Reg. 3880 (January 26, 2018).........................................9, 12, 13

84 Fed. Reg. 23170 (May 21, 2019) ..................................................*passim*

Fed. R. App. P. 29 .......................................................................3

Alaska Stat. §13.52.060 ...............................................................9

Ariz. Rev. Stat. §36-2154..........................................................9, 10

Conn. Agencies Regs. §19-13-D54 .................................................9

Fla. Stat. §390.0111 ....................................................................9

Ga. Code Ann. § 16-12-142 .........................................................10

Haw. Rev. Stat. 327E-7 ...............................................................9

Idaho Code §18-611......................................................................9

Ill. Comp. Stat. 70/6 ....................................................................9

Ill. Comp. Stat. 70/12 ................................................................10

Ind. Code Ann. §16-34-1-7 .........................................................10

Ky. Rev. Stat. §311.800 ...............................................................9

La. Rev. Stat. §40:1061.20 ...........................................................9

La. Stat. §40:1061.2 .....................................................................9

Md. Code Ann., Health–Gen. §20-214 ..........................................9

Miss. Code Ann. §41-107-5 ..........................................................9

Miss. Code Ann. §41-107-11.........................................................10

Mo. Rev. Stat. §197.032 ..............................................................10

Mont. Code Ann. § 50-20-111 ................................................................. 9

N.D. Cent. Code §23-06.5-09 ................................................................. 9

N.M. Stat. §24-7A-7 ............................................................................... 9

N.Y. Civ. Rights Law §79-i ..................................................................... 9

Neb. Rev. Stat. §28-340–41 .................................................................. 10

Ohio Constitution, Article I, Section 7 ............................................... 2, 6

Ohio Rev. Code §4731.91 ..................................................... 2, 9, 10, 15

Okla. Stat. tit. 63, §1-728f .................................................................... 10

Or. Rev. Stat. §435.485 ........................................................................... 9

18 Pa. Cons. Stat. §3213 ..................................................................... 9, 10

S.C. Code Ann. §44-41-50 .................................................................... 10

S.D. Codified Laws §§34-23A-11, 36-11-70 ....................................... 10

Tex. Occ. Code §103.003 ...................................................................... 10

Utah Code Ann. §76-7-306 .................................................................. 10

W. Va. Code §16-30-12 ........................................................................... 9

Wash. Rev. Code §48.43.065 .................................................................. 9

Wis. Stat. §253.09 .................................................................................... 9

## Other Authorities

Bray, *Multiple Chancellors*, 131 Harv. L. Rev. 418 (2017) .............. 18, 19, 20

McConnell, *Free Exercise Revisionism and the Smith Decision*, 57 U. Chi.
L. Rev. 1109 (1990) .............................................................................. 6

McConnell, *The Origins and Historical Understanding of Free Exercise of
Religion*, 103 Harv. L. Rev. 1409 (1990) ...................................... 1, 5, 7

Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018) ........................ 23

*Selected Rural Healthcare Facilities in Ohio*, Rural Health Information Hub ................................................................................................................. 15

Sohoni, *The Lost History of the "Universal" Injunction*, 133 Harv. L. Rev. 920 (2020) .............................................................................................. 18

Stone*, The Conscientious Objector*, 21 Col. Univ. Q. 253 (1919) ................................ 1

Sutton, *51 Imperfect Solutions: The Making of State Constitutional Law* (2018) ............................................................................................................. 7

Theriot & Connelly, *Free to Do No Harm: Conscience Protections for HealthCare Professionals*, 49 Ariz. St. L. J. 549 (2017) ........................................ 8

Washington, *Letter to the Hebrew Congregation* in THE U.S. CONSTITUTION: A READER, 137 (2012 Hillsdale College Press) .................. 1, 24

Williams, *Due Process, Class Action Opt Outs, and the Right not to Sue*, 115 Colum. L. Rev. 599 (2015) ....................................................................... 21

Woolhandler & Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689 (2004) ............................................................................... 17

## INTRODUCTION AND STATEMENT OF *AMICI* INTEREST

George Washington, in a letter to the Jewish congregation of Newport, Rhode Island, wrote that the "Citizens of the United States of America have a right to applaud themselves for having given to mankind examples of an enlarged and liberal policy"—one in which "*All* possess alike liberty of conscience." Washington, *Letter to the Hebrew Congregation* in THE U.S. CONSTITUTION: A READER, 137 (2012 Hillsdale College Press) (emphasis added). Indeed, respect for liberty of conscience has "deep roots in the practices of the American states both before and after independence." McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1412 (1990). "All our history gives confirmation to the view that liberty of conscience has a moral and social value which makes it worthy of preservation at the hands of the state." Stone*, The Conscientious Objector*, 21 Col. Univ. Q. 253, 269 (1919). "So deep in its significance" is the freedom to live according to one's own conscience that "nothing short of self-preservation of the state should warrant its violation." *Id.*

Healthcare is one area where protecting conscience is particularly vital. Many doctors, nurses, and other healthcare professionals have religious or moral objections to certain procedures, like abortion or assisted suicide. That is why Congress has routinely enacted laws to ensure that these professionals can provide

care without violating their beliefs. These conscience protections prohibit recipients of federal funding from discriminating against conscientious objectors. In support of Congress's actions, the Department of Health and Human Services recently published new regulations to promote awareness of federal conscience protections and ensure their enforcement. *See* 84 Fed. Reg. 23170 (May 21, 2019). The Department's dual goals of awareness and enforcement make sense: for conscience protections to work well, they must be common knowledge to those in the medical field and there must be some mechanism for punishing violations.

Ohio and the other *amici* States support the new regulations. These States employ similar or more expansive conscience protections of their own. The Ohio Constitution, for example, broadly prohibits "any interference with the rights of conscience." Ohio Constitution, Article I, Section 7; *see also Humphrey v. Lane*, 89 Ohio St. 3d 62 (2000). Ohio's statutory law also shields people from any pressure to perform or participate in abortions. Ohio Rev. Code §4731.91. These and other state conscience protections have a long history. And they have *not* led to the negative healthcare results that New York and other plaintiff States imagine. To give the perspective of the many States that favor the new regulations—the many States committed to the idea that no common good worth pursuing denies citizens their

inherent liberty of conscience—the *amici* States are filing this brief in support of the United States under Rule 29(a)(2).

## ARGUMENT

Within their opening briefs, the Department and the intervenors explain the many errors the District Court made in granting the challengers relief. Rather than repeat all of those arguments, this brief homes in on two points. *First*, the District Court erred by insisting that the new regulations will produce "game-changing" alterations that threaten "patient health and safety." *New York v. United States HHS*, 414 F. Supp. 3d 475, 524, 565 (S.D.N.Y. 2019). This prediction rests on assumptions, not evidence. Indeed, it is *contrary to* the evidence; half a century of conscience protections in the States have had no adverse effect on healthcare access or healthcare outcomes. *Second*, the District Court erred by entering a "universal injunction"—that is, an order enjoining the regulations in their application to non-parties, nationwide. *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). Article III does not empower courts to award such injunctions. Even if it did, the District Court erred by awarding such relief here.

**I.** **The new regulations are consistent with this country's long history of protecting conscience.**

The challengers' arguments, and the District Court's conclusions, rest on the implicit assumption that the Department's new regulations will dramatically alter conscience protections. At different points, the District Court, gazing into its crystal ball, predicted that the regulations would be "transformative," 414 F.Supp.3d at 513, "heretofore unrecognized," *id.* at 523, "game-changing," *id.* at 524, "economically and politically … consequential," *id.* at 530, and "an unforeseeable departure from the status quo," *id.* at 569.

The on-the-ground facts show the District Court's crystal ball needs a good deal of calibration. Those facts include the States' long history of protecting medical providers' rights of conscience without any "game-changing" effects on healthcare. If conscience protections of the sort created by the new regulations really did have such serious adverse effects, there would be ample evidence of that in the many States—including the challenger States—that have such laws. But the challengers produced no such evidence, probably because there is none.

**A.** **Since this country's founding, the States have protected individual beliefs, often more vigorously than federal law.**

**1.** The Department's regulations are a recent chapter in this country's "long history of providing protections … on the basis of religious beliefs and moral

convictions." 84 Fed. Reg. 23170, 23170 (May 21, 2019). That history actually begins with the States. By the time the federal Constitution was ratified, all but one of the original thirteen States already had constitutional protections for religious freedom. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1455 (1990). New York's 1777 Constitution, for example, protected "liberty of conscience" from "discrimination or preference" if such liberty did not endanger "peace or safety." *Id.* at 1456 (quotations omitted). The Georgia Constitution similarly granted "[a]ll persons … free exercise of religion; provided it not be repugnant to the peace and safety of the State." *Id.* at 1457 (quotations omitted).

The United States Constitution shows the States' influence. Its First Amendment provides that "Congress shall make no law respecting an establishment of religion, *or prohibiting the free exercise thereof*." U.S. Const. amend. I (emphasis added). For years the Supreme Court interpreted the Free Exercise Clause to mean that States may not require citizens to contradict their religious beliefs absent a compelling government interest. *See, e.g.*, *Sherbet v. Verner*, 374 U.S. 398, 403 (1963); *Wisconsin v. Yoder*, 406 U.S. 205, 214, 221 (1972); *Hobbie v. Unemployment Appeals Comm.*, 480 U.S. 136, 141 (1987). That changed thirty years ago, when the Court held that the Free Exercise Clause does not excuse *anyone* from

having to comply with neutral, generally-applicable laws that require them to contradict their religious beliefs. *Employment Div. v. Smith*, 494 U.S. 872, 880 (1990). Many commenters criticized the switch, partly because *Smith* failed to explore the Free Exercise Clause's history. McConnell, *Free Exercise Revisionism and the Smith Decision*, 57 U. Chi. L. Rev. 1109, 1116–17 (1990). As part of the fallout, Congress enacted the Religious Freedom Restoration Act of 1993—and later the Religious Land Use and Institutionalized Persons Act of 2000—to provide greater protections for religious exercise. *See Holt v. Hobbs*, 574 U.S. 352, 357–58 (2015).

Of course, the States "possess authority to safeguard individual rights above and beyond the rights secured by the U.S. Constitution." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2094 (2019) (Kavanaugh, J., concurring) (citing Sutton, *51 Imperfect Solutions: The Making of State Constitutional Law* (2018); Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489 (1977)). When it comes to the free exercise of religion, many States have done just that. The Ohio Constitution, for example, acknowledges the "natural and indefeasible right to worship Almighty God according to the dictates of their own conscience." Ohio Constitution, Article I, Section 7. It goes on to prohibit any religious preference and "any interference with the rights of conscience." *Id.* The Ohio Supreme Court has confirmed that "the words of the Ohio framers … make

6

an independent statement on the meaning and extent of [religious] freedom." *Humphrey v. Lane*, 89 Ohio St. 3d 62, 66–67 (2000). And "the Ohio Constitution's free exercise protection is broader" than federal protection: it forbids the government from applying even neutral, generally applicable laws in ways that violate religious freedom, unless the law serves "a compelling state interest" and is "the least restrictive means of furthering that interest." *Id.* at 68. Many other state courts— from Maine and Massachusetts to Washington and Alaska—have likewise held that state constitutions require a more demanding free-exercise inquiry than the federal Constitution. Sutton, *51 Imperfect Solutions* 207, 271 n.19 (compiling authority).

**2.** Objections to military conscription provide an early example of conscience protections in action. Several colonies exempted conscientious objectors from conscription into military service. *Origins and Historical Understanding*, 103 Harv. L. Rev. at 1468–69. The federal government again followed suit. When the federal government first conscripted troops during the Civil War, it exempted conscientious objectors who belonged to religious denominations that opposed bearing arms. *United States v. Seeger*, 380 U.S. 163, 171 (1965). Later, during the Vietnam War, the Supreme Court extended federal exemptions for conscientious objectors to people with nontraditional religious beliefs as long as those beliefs were sincerely held. *Id.* at 165–66; *see also Welsh v. United States*, 398 U.S. 333 (1970).

7

Liberty of conscience is not limited to times of war. Over the past fifty years, conscience protections have become a consistent feature of healthcare laws. These protections trace back to *Roe v. Wade*, 410 U.S. 113 (1973). Shortly after *Roe v. Wade*, a federal court forced a catholic hospital to permit a sterilization procedure that violated the hospital's religious directives. *See Taylor v. St. Vincent's Hospital*, 369 F. Supp. 948, 950 n.1 (D. Mont. 1973). That decision sparked action at both the federal and state levels. Congress responded with the Church Amendments. The Amendments protect recipients of certain federal funds from being compelled to perform or assist in procedures contrary to their religious or moral beliefs. 42 U.S.C. §300a-7(b). They also prohibit discrimination against medical personnel based on their refusal to perform or assist with procedures. 42 U.S.C. §300a-7(c). Since the Church Amendments, Congress has routinely attached conscience protections to federal healthcare spending. *See* 84 Fed. Reg. at 23170–74 (collecting federal conscience statutes). As a recent example, the Affordable Care Act prohibits discrimination against healthcare entities or individuals that refuse to perform assisted suicides. 42 U.S.C. §18113(a).

States, for their part, have not rested on federal spending conditions to protect their citizens' beliefs. Indeed, nearly all the States have enacted their own conscience protections—many of which are quite broad. *See* Theriot & Connelly,

*Free to Do No Harm: Conscience Protections for HealthCare Professionals*, 49 Ariz. St. L. J. 549, 587–600 (2017) (surveying state conscience protections); *see also* 83 Fed. Reg. 3880, 3899 n.47 (January 26, 2018). On the subject of abortion, Ohio law provides that "[n]o person is required to perform or participate in medical procedures which result in abortion," regardless of where funding for the procedure comes from. Ohio Rev. Code §4731.91. And many States—including some of the challengers here—offer similarly broad protections in the abortion context. *See, e.g.*, Ariz. Rev. Stat. §36-2154(A); Conn. Agencies Regs. §19-13-D54(f); Fla. Stat. §390.0111(8); Ky. Rev. Stat. §311.800(4); La. Stat. §40:1061.2; Md. Code Ann., Health–Gen. §20-214(a); Mont. Code Ann. § 50-20-111(2); N.Y. Civ. Rights Law §79-i; Or. Rev. Stat. §435.485; 18 Pa. Cons. Stat. §3213(d); Wis. Stat. §253.09(1).

Conscience protections in many States extend beyond abortion. Some protections (again, including those enacted by the challengers) cover *any* healthcare service that goes against a person's beliefs. Idaho Code §18-611(2); 745 Ill. Comp. Stat. 70/6; La. Rev. Stat. §40:1061.20(A)(1); Miss. Code Ann. §41-107-5; Wash. Rev. Code §48.43.065. Other States allow medical professionals to refuse to participate in any healthcare decision that violates their beliefs. Alaska Stat. §13.52.060(e); Haw. Rev. Stat. 327E-7(e); N.M. Stat. §24-7A-7(E); N.D. Cent. Code §23-06.5-09(2); W. Va. Code §16-30-12(b)(1). And South Dakota, as another

variation, extends its conscience protections to cover counselors, social workers, and pharmacists. S.D. Codified Laws §§34-23A-11, 36-11-70; *see also* Ariz. Rev. Stat. §36-2154(B); Ga. Code Ann. § 16-12-142(b) .

Finally, state approaches often differ from federal law with regard to enforcement. For federal conscience protections, courts have thus far held that no private right of action is available. *See, e.g.*, *Cenzon-DeCarlo v. Mount Sinai Hosp.*, 626 F.3d 695, 696 (2d Cir. 2010); *Hellwege v. Tampa Family Health Ctrs.*, 103 F. Supp. 3d 1303, 1312 (M.D. Fla. 2015). Many States, on the other hand, have created private causes of action for enforcement of conscience protections. *See, e.g.*, Ind. Code Ann. §16-34-1-7; 745 Ill. Comp. Stat. 70/12; Miss. Code Ann. §41-107-11; Mo. Rev. Stat. §197.032(3); Neb. Rev. Stat. §28-340–41; Ohio Rev. Code §4731.91(E); Okla. Stat. tit. 63, §1-728f; 18 Pa. Cons. Stat. §3213(d); S.C. Code Ann. §44-41-50(c); Tex. Occ. Code §103.003; Utah Code Ann. §76-7-306(6). Employees in Ohio, for example, can sue for damages if their employer disciplines them for refusing to participate in an abortion. Ohio Rev. Code §4731.91(E).

An ongoing case in the Land of Lincoln shows another State's conscience protections at work. *Rojas v. Martell*, 2020 IL App (2d) 190215. The case involves a nurse, Sandra Rojas, who brought a private action against her former employer, a county health department, under Illinois' Right of Conscience Act. *Id.*, ¶1. A few

years back, the county informed its nurses that, as part of a health initiative, they would need to perform new family planning and women's health services. *Id.*, ¶5. Shortly thereafter, Rojas provided the county with advance notice that she was uncomfortable providing certain services, including abortion referrals, because of her religious beliefs. *Id.*, ¶6. The county refused to accommodate Rojas and instead suggested that she transfer to a different position. *Id.*, ¶7. Rojas sued and, this past March, an appellate court remanded her claims for further proceedings. In doing so, it held that Illinois law offers broader conscience protections than Title VII of the Civil Rights Act of 1964. *Id.*, ¶¶25–51. At the same time, it rejected any "absurd" reading of Illinois law that would require a provider "to pay an employee" who objected to "a major portion or all of the employee's work." *Id.* at ¶57; *id.* at ¶¶51–58. In other words, much like federal conscience protections, *see* 84 Fed. Reg. at 23191–92, Illinois' conscience protections strike a balance between protecting employees' rights (above and beyond Title VII's framework) and preventing impractical consequences for employers.

## B. The District Court overlooked state conscience protections when it considered the potential impact of the new regulations.

The States' extensive history of conscience protections matters to this case. The many diverse conscience protections across the States show that conscience protections and good healthcare can co-exist. At minimum, the prevalence of state

conscience protections casts serious doubt on whether the Department's new regulations will reshape the conscience-protection landscape.

Still, New York and the other plaintiff States assume the worst. They seek facial invalidation of the new regulations before any enforcement. That is a big ask, and it comes with a high bar. Even assuming the plaintiffs' claims were ripe for review, *see Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803, 808–09 (2003), they needed to show that there are no possible set of circumstance under which the regulations would be valid. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008). In the Administrative Procedure Act context, that means showing more than just "a hypothetical case in which" the regulations might lead to an arbitrary or unauthorized result. *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 619 (1991).

As an initial matter, the challengers missed their chance to produce evidence that the new rules would negatively affect healthcare by failing to produce any meaningful evidence during the rulemaking process. In proposing the new regulations, the Department noted that many States offer additional conscience protections on top of federal laws. 83 Fed. Reg. at 3899 & n.47. And the Department expressly requested data about "whether the existence or expansion of rights to exercise religious beliefs or moral convictions in health care improves or worsens pa-

tient outcomes and access to health care." *Id.* at 3900. Opponents to the regulations were unable to identify data showing that existing conscience protections have negatively affected "access to care or health outcomes." 84 Fed. Reg. at 23180.

If there were any such negative effects, it should have been easy to find data saying so. After all, the States—including the challengers here—have had similar protections in place for many years. As Sherlock Holmes would note, one expects dogs to bark. *See Johnson v. Acevedo*, 572 F.3d 398, 401 (7th Cir. 2009). Instead of producing data, the plaintiff States attempted to carry their heavy burden below by invoking doomsday predictions. The drum major in their parade of horribles was a baseless assumption that medical professionals with conscience objections are lying in wait to begin raising objections without advance notice once the regulations go into effect. *See* Compl. ¶¶3, 5, Case No. 1:19-cv-4676, R.3. Following closely behind, the challengers imagined hypothetical scenarios, like medical emergencies involving ectopic pregnancies, where such no-notice objections could, in theory, interfere with a healthcare provider's obligations under federal law. *See id.*, ¶5. They then presumed that these scenarios will be "especially pronounced" in rural areas, *id.*, ¶131, and will impede access to emergency healthcare services, *id.*, ¶103.

Finally, the plaintiff States supposed far-fetched enforcement actions, alleging that "billions of dollars in federal health care funds" are at stake. *Id.*, ¶4.

The District Court embraced this cataclysmic thinking throughout its analysis. It spent a great deal of time hypothesizing how the new regulations *might* potentially conflict with Title VII or the Emergency Medical Treatment and Labor Act. *See New York v. United States HHS*, 414 F. Supp. 3d at 513–14, 536–39, 555–58. And it broadly speculated about downstream consequences on healthcare staffing; at one point it wondered whether "a remote clinic might be required to add duplicate staff if an employee objected to the clinic's abortion work but refused to take on a different assignment within the small clinic." *Id.* at 514. (How many medical professionals who morally object to abortions work at clinics where abortions are performed? Presumably very few such people "have sought out such jobs." 84 Fed. Reg. at 23192.) Later, the court opined about "rural settings involving smaller or remote providers, where a single employee's abstention on account of a conscience objection could pose a heightened threat to patient health and safety." *New York v. United States HHS*, 414 F. Supp. 3d at 565. Then, in considering potential enforcement of the new regulations, the District Court readily credited the plaintiff States' fear that they were at risk of "losing billions of dollars in federal funding." *Id.* at 563.

14

The problem with all this conjecture is that it is contradicted by hundreds of years of state and federal protections for free exercise generally, and by fifty years of conscience protections specifically related to healthcare. Many States—and perhaps especially those States with the "rural" populations about which the District Court fretted—have imposed similar, or greater, conscience protections for decades. If such protections truly caused the sweeping problems the District Court envisioned, the States' experiences would show as much. Yet, in reality, the opposite is true. State conscience protections have long been in place without any widespread problems.

To illustrate, return to the Buckeye State. For over forty-five years, Ohio law has allowed healthcare employees to refuse to participate in abortions. Ohio Rev. Code §4731.91. This statute contains no explicit exception for emergencies. Nor does it allow employers to refuse accommodations based on undue hardship. And Ohio conscience protections also allow objectors to enforce the law themselves in civil suits. Ohio Rev. Code §4731.91(E). Despite these broad features, healthcare facilities have been able to operate throughout Ohio—including in rural Ohio. *See Selected Rural Healthcare Facilities in Ohio*, Rural Health Information Hub, https://bit.ly/338oAoo (map based on October 2019 data). To date, Ohio's conscience protections have led to little litigation, signaling that healthcare em-

ployers have been able to respect their employees' conscience rights while still providing healthcare access, including access in emergency situations.

*      *      *

This Court famously observed that dissenting opinions often "partake of Cassandra's gloom more than of her accuracy." *United Bhd. of Carpenters & Joiners v. Vincent*, 286 F.2d 127, 132 (2d Cir. 1960). The same can sometimes be said of effects-focused arguments against government policies. The plaintiffs' gloom is no substitute for evidence.

## II. The District Court awarded overbroad relief that exceeded its judicial power.

The District Court enjoined the challenged regulations in *all* of their applications, including in their applications to non-parties. *New York v. United States HHS*, 414 F. Supp. 3d at 578–80. In other words, the District Court granted a universal injunction. For three reasons, it ought not have done so. *First*, Article III courts have no power to award universal injunctions. *Second*, universal injunctions raise practical concerns that support eliminating or limiting their use. *Third*, even if universal injunctions were sometimes lawful, the circumstances of this case did not justify the issuance of such an injunction.

**A.** The biggest problem with universal injunctions is that federal courts have no authority to grant them. True, this Court on at least one occasion has affirmed a

16

judgment awarding such relief. *See Harlem Valley Transp. Ass'n v. Stafford*, 500 F.2d 328, 330 (2d Cir. 1974). That decision, however, did not directly confront where the power to award such relief comes from, and cases are not precedential as to issues not considered. *See Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). So it makes sense to begin with first principles.

Article III of the Constitution gives courts "[t]he judicial Power." U.S. Const. art. III, §1. That power permits them to resolve only "Cases" and "Controversies." *Id.* at §2. This cases-and-controversies limitation means that courts may resolve only concrete legal disputes—disputes regarding *specific* issues between *specific* parties. *See generally Lewis v. Casey*, 518 U.S. 343, 349 (1996). This "restricts the federal judicial power 'to the traditional role of the Anglo-American courts.'" *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132 (2011) (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 492 (2009)). As a result, courts may award relief only to parties who seek relief for a concrete injury. So while courts may "provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm," *Lewis v. Casey*, 518 U.S. 343, 349 (1996), they may not award relief unrelated to any discrete dispute between parties. For example, courts may not entertain suits by individuals purporting to represent injuries suffered by the public generally. *See Ariz. Christian Sch.*, 563 U.S. at 138;

Woolhandler & Nelson, *Does History Defeat Standing Doctrine*?, 102 Mich. L. Rev. 689, 700-701 (2004).

Universal injunctions invert these principles. They permit parties to assert *non-parties*' interests and to obtain relief for those non-parties. That is exactly what Article III's cases-and-controversies limitation is supposed to prevent. Perhaps because of this, universal injunctions did not exist historically. Indeed, no court issued one until the twentieth century, and they remained rare until recent years. Bray, *Multiple Chancellors*, 131 Harv. L. Rev. 418, 437, 457–59 (2017); *cf.* Sohoni, *The Lost History of the "Universal" Injunction*, 133 Harv. L. Rev. 920, 924–26 (2020). Here, as in many other contexts, "the most telling indication of" a "severe constitutional problem" is "the lack of historical precedent." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 505 (2010) (quoting *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting)).

In addition to ignoring Article III's case-or-controversy limitation, universal injunctions exceed the scope of the federal courts' equitable authority. The federal courts must wield their authority to issue equitable relief according to "the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of" the American Revolution. *Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 318 (1999)

(quotations omitted); *accord Boyle v. Zacharie*, 31 U.S. 648, 655–57 (1832) (per Story, J.). Those principles bar the award of relief to non-parties. *Trump v. Hawaii*, 138 S. Ct. 2392, 2424–29 (Thomas, J., concurring); *see also* Bray, *Multiple Chancellors*, 131 Harv. L. Rev. at 427. Again, "as a general rule, American courts of equity did not provide relief beyond the parties to the case" until the second half of the twentieth century. *Trump*, 138 S. Ct. at 2427 (Thomas, J., concurring). Instead, American courts of equity would decline to award relief that went "beyond the case before" them. *Conway v. Taylor's Ex'r*, 66 U.S. 603, 632, 1 Black 603, 632 (1861). And because this form of equitable relief was unavailable in the English Court of Chancery in the eighteenth century, it is similarly unavailable in federal courts today.

**B.** The unconstitutionality of universal injunctions is reason enough to curtail their use. But there are other reasons, too. The first is that the availability of universal injunctions create "nearly boundless opportunity to shop for a friendly forum to secure a win nationwide." *Dep't of Homeland Sec.*, 140 S. Ct. at 601 (Gorsuch, J., concurring). If courts set a precedent of awarding nationwide injunctions, they will give advocates great incentive to structure their litigation strategies to pick out what they perceive to be the most favorable forums to obtain invalidation of whatever federal laws they dislike. After all, the stakes of forum shopping "are

asymmetric." *Id.* When a court "*upholds* the challenged law, that decision has no effect on other potential plaintiffs. But if one district judge *invalidates* it and issues a national injunction, the injunction controls the defendant's actions with respect to everyone." Bray, *Multiple Chancelors*, 131 Harv. L. Rev. at 460.

This very case exemplifies this "[s]hop 'til the statute drops" approach to litigation. *Id.* Litigants challenged the new regulations in multiple district courts. *See City & Cty. of San Francisco v. Azar*, 411 F. Supp. 3d 1001 (N.D. Cal. 2019); *Washington v. Azar*, No. 2:19-cv-00183, 2019 U.S. Dist. LEXIS 203304 (E.D. Wash. No. 21, 2019). Understandably so: if just *one* litigant prevailed in a *single* challenge, that litigant could win an order enjoining the regulations in all their applications from sea to shining sea.

This shop-'til-the-statute-drops approach, in addition to putting government defendants at a stark disadvantage, also hurts the development of the law. For one thing, it "tend[s] to force  judges into making rushed, high-stakes, low-information decisions." *Dep't of Homeland Sec.*, 140 S. Ct. at 600 (Gorsuch, J., concurring) (citation omitted). And by making all parallel proceedings irrelevant, universal injunctions deny appellate courts the benefit that comes from reviewing an issue after having received analyses from multiple judges making decisions on different records prepared by different parties. *Trump*, 138 S. Ct. at 2425 (Thomas, J., concur-

ring).  Then there is the reputational hit.  To the general public, the practice of
rushing to particular forums to secure nationwide relief unavailable through the
normal political process makes courts look, however unfairly, like partisan actors.
Courts must not forget that they "have neither Force nor Will, but merely judg-
ment."  The Federalist, No. 78, p. 523 (A. Hamilton) (Cooke, ed., 1961).  "The ju-
diciary's authority therefore depends in large measure on the public's willingness
to respect  and follow its decisions."  *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 445-
46 (2015).  That, in turn, requires exercising equitable authority so as to prevent
even the appearance of being pulled into the political fray.

A final problem with universal injunctions is that they force third parties to
assert legal rights even when they would rather not do so.  In that respect, universal
injunctions contradict the rest of Anglo-American jurisprudence, which typically
leaves to individuals the decision of whether to press rights. Criminal defendants,
for example, may waive their right to a jury trial, opting instead for a bench trial.
Similarly, potential class members may opt out of a class if they object to the suit or
would prefer to litigate individually.  No one makes *those* parties press rights they
would prefer not to exercise. *See generally* Williams, *Due Process, Class Action Opt
Outs, and the Right not to Sue*, 115 Colum. L. Rev. 599, 605 (2015).  But here, a uni-
versal injunction forces the *amici* States to accept "relief" they do not want.

**C.** Even if universal injunctions were sometimes appropriate, such an injunction would be inappropriate here. Injunctive relief should be molded "to the necessities of the particular case," *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (citation omitted), and "no more burdensome to the defendant[s] than necessary to provide complete relief *to the plaintiffs*," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added).

A universal injunction is unnecessary to afford the plaintiffs complete relief. The District Court addressed challenges from the plaintiff States, a few local governments, and a handful of private plaintiffs. *New York v. United States HHS*, 414 F. Supp. 3d at 578. The plaintiff States and local governments have no interest in whether the new rules apply in other States. Below, they alleged that the Department's new regulations would interfere with *their* laws and would jeopardize *their* healthcare funding. Those allegations at most justify enjoining the new regulations within those plaintiffs' borders. As for the private plaintiffs, their only conceivable interest is in preventing the regulations from being applied *to them*—no injury to the private plaintiffs could justify enjoining the regulations in their application to non-parties.

What is more, a universal injunction *harms* many third parties. It harms the States and local governments that agree with the Department and want robust fed-

eral conscience protections for their residents. It harms people currently in the healthcare field who are either unaware of their conscience rights or hesitant to invoke them. And it harms people who would be open to working in healthcare if they were more confident that their beliefs would be respected.

**D.** In granting a universal injunction, the District Court did not address these problems. *See id.* at 578–80. It claimed broad authority under the Administrative Procedure Act to grant "programmatic" relief. *Id.* at 579 (citation omitted). That position is a non-starter, since the Administrative Procedure Act cannot grant a court authority beyond what Article III allows. Even if it could, nothing in that Act—which was enacted in 1946, decades before universal injunctions became popular—suggests that Congress intended "a drastic departure from the traditions of equity practice." *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). While the Act instructs courts to "set aside" unlawful agency action, 5 U.S.C. §706(2), it in no way mandates relief "for the entire country," *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 394 (4th Cir. 2001). It is just as natural to speak of "setting aside" an agency action *as to one party* as it is to speak of doing the same for an entire nation. Indeed, it is more natural: the judicial power enables courts to award relief to *parties* in concrete disputes; it does not enable courts to remove statutes or

regulations from the books.  Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 935–36 (2018).  That is a quintessentially non-judicial task.

## CONCLUSION

"It is now no more that toleration is spoken of, as if it was by the indulgence of one class of people, that another enjoyed the exercise of their inherent natural rights."  Washington, *Letter to the Hebrew Congregation* in THE U.S. CONSTITU-TION: A READER, 137 (2012 Hillsdale College Press).  Because the challenged regulations expand the opportunities for Americans to exercise their inherent natural right to liberty of conscience, the *amici* States support the regulations' implementation.  This Court should reverse the District Court.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS
Ohio Solicitor General*
   *\*Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
benjamin.flowers
  @ohioattorneygeneral.gov

*Counsel for the State of Ohio*
*(additional counsel listed after signature block)*

# ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General of Alabama

KEVIN G. CLARKSON
Attorney General of Alaska

MARK BRNOVICH
Attorney General of Arizona

LESLIE RUTLEDGE
Attorney General of Arkansas

CHRISTOPHER M. CARR
Attorney General of Georgia

DANIEL CAMERON
Attorney General of Kentucky

JEFF LANDRY
Attorney General of Louisiana

ERIC SCHMITT
Attorney General of Missouri

TIMOTHY C. FOX
Attorney General of Montana

DOUGLAS J. PETERSON
Attorney General of Nebraska

MIKE HUNTER
Attorney General of Oklahoma

ALAN WILSON
Attorney General of South Carolina

JASON RAVNSBORG
Attorney General of South Dakota

HERBERT H. SLATERY III
Attorney General of Tennessee

SEAN D. REYES
Attorney General of Utah

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) and of the Federal Rules of Appellate Procedure and Second Circuit Local Rule 29.1(c), that this motion complies with the type-volume for a principal brief and contains 5,310 words. See Fed. R. App. P. 32(a)(7)(B)(i).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2020, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS