# 19-4254-cv(L),

## 20-0031-cv(CON), 20-0032-cv(CON), 20-0041-cv(CON)

# United States Court of Appeals
## for the
# Second Circuit

STATE OF NEW YORK, CITY OF NEW YORK, STATE OF COLORADO,
STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA,
STATE OF HAWAII, STATE OF ILLINOIS, STATE OF MARYLAND,
COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN,
STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY,
STATE OF NEW MEXICO, STATE OF OREGON, COMMONWEALTH OF
PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT,
COMMONWEALTH OF VIRGINIA, STATE OF WISCONSIN,
CITY OF CHICAGO, COOK COUNTY, ILLINOIS,

*Plaintiffs-Appellees,*

*(For Continuation of Caption See Reverse Side of Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)

## BRIEF OF *AMICI CURIAE* RACHAEL LORENZO, MINDY SWANK AND MEGHAN EAGEN IN SUPPORT OF APPELLEES AND FOR AFFIRMANCE

PAMELA A. MILLER
MIA N. GONZALEZ
CATHERINE D. NAGLE
FRANCES A. ZIESING
LAURA K. KAUFMANN
O'MELVENY & MYERS LLP
*Attorneys for Amici Curiae*
Times Square Tower
7 Times Square
New York, New York 10036
(212) 326-2000

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.,
PLANNED PARENTHOOD OF NORTHERN NEW ENGLAND, INC.,
NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH
ASSOCIATION, PUBLIC HEALTH SOLUTIONS, INC.,

*Consolidated-Plaintiffs-Appellees,*

– v. –

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
ALEX M. AZAR, II, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
UNITED STATES OF AMERICA,

*Defendants-Appellants,*

DR. REGINA FROST, CHRISTIAN MEDICAL AND DENTAL ASSOCIATION,

*Intervenors-Defendants-Appellants,*

ROGER T. SEVERINO, IN HIS OFFICIAL CAPACITY AS DIRECTOR,
OFFICE FOR CIVIL RIGHTS, UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, AND OFFICE FOR CIVIL RIGHTS,
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

*Consolidated-Defendants-Appellants.*

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ................................................................1

INTRODUCTION .............................................................................1

ARGUMENT ...................................................................................3

I.    Refusals of Health Care Have Resulted in Hospitals Denying or Delaying Lifesaving Reproductive Health Care in Violation of Their Legal Obligations Under EMTALA....................................................3

II.   The Rule Prevents Hospitals from Providing the Care EMTALA Requires. ....................................................................................6

III.  Patients Have Suffered Harm from EMTALA Violations, Including Due to Religious Refusals of Care. .................................................7

      A.    Rachael Lorenzo.....................................................................8

      B.    Mindy Swank .......................................................................11

      C.    Meghan Eagen ....................................................................15

IV.  Refusals of Health Care Are Not New, but the Rule Would Make Them Widespread, Disproportionately Affecting Women of Color.............17

CONCLUSION ................................................................................21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*California v. United States*,
2008 WL 744840 (N.D. Cal. Mar. 18, 2008) ........................................................3

*Matter of Baby K*,
16 F.3d 590 (4th Cir. 1994) ...................................................................................6

*Morin v. E. Maine Med. Ctr.*,
780 F. Supp. 2d 84 (D. Me. 2011)..........................................................................5

*New York v. United States Dep't of Health and Human Servs.*,
414 F. Supp. 3d 475 (S.D.N.Y. 2016) ....................................................................7

*Owens v. Nacogdoches Cty. Hosp. Dist.*,
741 F. Supp. 1269 (E.D. Tex. 1990) ......................................................................3

**Statutes**

42 U.S.C. § 1395dd(a)–(b), (e)(3)(A) ..................................................................2, 3

42 U.S.C. § 1395dd(c) ............................................................................................3

**Other Authorities**

Am. Coll. of Obstetricians and Gynecologists, Committee on Ethics, *The Limits of Conscientious Refusal in Reproductive Medicine* (Nov. 2007, *reaff'd* 2016), https://www.acog.org/-/media/project/acog/acogorg/clinical/files/committee-opinion/articles/2007/11/the-limits-of-conscientious-refusal-in-reproductive-medicine.pdf.....................................................................4

Amy Littlefield, *A Miscarrying Woman Nearly Died After a Catholic Hospital Sent Her Home Three Times*, Rewire News (Sept. 25, 2019), https://rewire.news/article/2019/09/25/miscarriage-catholic-hospital/...............16

*Civil Monetary Penalties and Affirmative Exclusions*, Office of Inspector General, U.S. Dep't of Health and Human Servs., https://oig.hhs.gov/fraud/enforcement/cmp/index.asp (last visited August 3, 2020)................................................................................................ 4, 5, 6

ii

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

Directive 45, U.S. Conf. of Catholic Bishops, *Ethical and Religious
Directives for Catholic Health Care* (June 2018),
https://www.usccb.org/about/doctrine/ethical-and-religious-
directives/upload/ethical-religious-directives-catholic-health-service-sixth-
edition-2016-06.pdf ............................................................................13

Full Frontal with Samantha Bee, *Extended Interview: Mindy Swank*,
YouTube (Oct. 27, 2016),
https://www.youtube.com/watch?time_continue=19&v=9finqZJJNA8 .............11

Julia Kaye, Brigitte Amiri, Louise Melling, & Jennifer Dalven, *Health Care
Denied, Patients and Physicians Speak Out About Catholic Hospitals and
the Threat to Women's Health and Lives* (May 2016),
https://www.aclu.org/sites/default/files/field_document/healthcaredenied.p
df .................................................................................... 11, 21

Kira Sheperd et al., *Bearing Faith: The Limits of Catholic Health Care for
Women of Color* 24 (Jan. 2018),
https://lawrightsreligion.law.columbia.edu/sites/default/files/content/Beari
ngFaith.pdf.................................................................... 19, 20, 21, 22

Lori R. Freedman, Uta Landy, & Jody Steinauer, *When There's a Heartbeat:
Miscarriage Management in Catholic-Owned Hospitals*, 98 Am. J. of Pub.
Health (2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2636458/........20

Mark R. Wicclair, *Conscientious Objection in Health Care: An Ethical
Analysis* (Cambridge University Press 2011)..........................................4

*Rachael's Life Hung in the Balance Because of Someone Else's Religious
Beliefs*, ACLU New Mexico (Oct. 1, 2019), https://www.aclu-
nm.org/en/news/rachaels-life-hung-balance-because-someone-elses-
religious-beliefs ........................................................................8

*Racial and Ethnic Disparities Continue in Pregnancy-Related Deaths*,
Centers for Disease Control and Prevention (Sept. 6, 2019)
https://www.cdc.gov/media/releases/2019/p0905-racial-ethnic-disparities-
pregnancy-deaths.html (last accessed August 3, 2020) .......................................22

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

**Regulations**

45 C.F.R. pt. 88 ...........................................................................................................1

## STATEMENT OF INTEREST[1]

Amici are Rachael Lorenzo, Mindy Swank, and Meghan Eagen: three individuals who were denied essential, stabilizing treatment because medical professionals refused to provide emergency abortions. Amici have an interest in this case because they wish to spare other individuals and families the trauma they suffered as a result of such treatment. In particular, amici submit this brief to rebut Defendants-Appellants' and Defendants-Intervenors' allegations that refusals or delays in essential care are "hypothetical" and do not occur in medical practice. Amici's own experiences disprove that statement. The Rule[2] would expand the ability of providers to refuse to provide emergency, life-saving treatment, leading others to endure the same trauma that amici suffered. This Court should affirm the decision of the court below.

## INTRODUCTION

The Emergency Medical Treatment and Labor Act ("EMTALA") is a federal law that requires hospitals with emergency departments receiving federal funds to provide emergency care and stabilizing treatment to any patient who

---

[1] No counsel for a party wrote this brief in whole or in part, and no one other than amici or their counsel contributed money to fund the preparation or submission of this brief. Additionally, this brief is filed with the consent of all parties as permitted by Rule 29(a)(2) of the Federal Rules of Appellate Procedure.

[2] Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 45 C.F.R. pt. 88 (2019) (the "Rule").

needs it, regardless of ability to pay.[3]  Refusal to provide emergency abortions to women suffering a medical crisis violates EMTALA and jeopardizes patient safety. The Rule would make such refusals of emergency stabilizing treatment based on personal objections widespread.

Defendants-Appellants United States Department of Health and Human Services, Alex M. Azar II, United States of America, Roger T. Severino, Office for Civil Rights at the United States Department of Health and Human Services (collectively, "HHS") and Defendant-Appellant Intervenors Dr. Regina Frost and Christian Medical and Dental Associations (collectively, "Intervenors") assert, without citing to any authority, that conflicts between religious-based refusals of care and hospitals' ability and responsibility to provide emergency and stabilizing treatment are purely hypothetical.  That is unequivocally false.  Studies have shown that religious-based refusals of health care do occur, cause serious harm to patients, and disproportionately impact people of color.  The experiences of the three amici who have endured the trauma of delays and denials of emergent reproductive health care belie Defendants-Appellants' assertion and illustrate the lasting physical and psychological toll of refusals that the Rule would enable.

---

[3] *See* 42 U.S.C. § 1395dd(a)–(b), (e)(3)(A).

# ARGUMENT

## I. Refusals of Health Care Have Resulted in Hospitals Denying or Delaying Lifesaving Reproductive Health Care in Violation of Their Legal Obligations Under EMTALA.

EMTALA obligates hospitals to screen any patient who comes to their emergency department seeking care for an emergency medical condition and, if such a condition exists, to provide the patient with appropriate "stabilizing" care that ensures their condition will not further deteriorate before they are discharged or transferred.[4] If the hospital cannot stabilize the patient with the facilities and staff available, the hospital must transfer the patient to a hospital that can and attest that the benefits of transfer outweigh the risks.[5]

For pregnant patients, active contractions, severe pain, vaginal bleeding, and leaking fluids can all be symptoms of "emergency medical conditions" requiring screening and stabilizing care.[6] Hospitals have been cited for EMTALA violations for turning away or failing to screen or treat pregnant patients with these symptoms

---

[4] *Id.*

[5] 42 U.S.C. § 1395dd(c).

[6] *See Owens v. Nacogdoches Cty. Hosp. Dist.*, 741 F. Supp. 1269, 1279 (E.D. Tex. 1990) (finding that discharge of pregnant woman with advice to go to another hospital violated EMTALA because the presence of active contractions meant she was "unstable"); *see also California v. United States*, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008) (describing how in multiple states the enforcement of refusal statutes creates a potential conflict with EMTALA and analogous state statutes).

3

and others, such as vomiting or lack of fetal heartbeat.[7]  Under EMTALA, hospitals must appropriately examine patients who present with these kinds of symptoms, diagnose their condition, and provide them with stabilizing treatment without delay, instead of sending them home, declining to disclose what care they need, or forcing them to go to another provider or hospital.[8]

When providers determine that patients are miscarrying or experiencing another life-threatening condition related to pregnancy, providing "stabilizing" care that meets accepted standards may require an evacuation of the uterus, which terminates the pregnancy.[9]  Without this care, pregnant individuals' lives and health can be put at risk, and their conditions can deteriorate quickly.  Refusing to give patients the emergency stabilizing care they need, or even to tell them they are experiencing a condition that might put their lives at risk, flouts EMTALA's requirements.

---

[7] *Civil Monetary Penalties and Affirmative Exclusions*, Office of Inspector General, U.S. Dep't of Health and Human Servs., https://oig.hhs.gov/fraud/enforcement/cmp/index.asp (last visited August 3, 2020).

[8] *Id.*; Mark R. Wicclair, *Conscientious Objection in Health Care: An Ethical Analysis* 100, 105 (2011).

[9] Am. Coll. of Obstetricians and Gynecologists, Committee on Ethics, *The Limits of Conscientious Refusal in Reproductive Medicine* (Nov. 2007, *reaff'd* 2016), https://www.acog.org/-/media/project/acog/acogorg/clinical/files/committee-opinion/articles/2007/11/the-limits-of-conscientious-refusal-in-reproductive-medicine.pdf.

Patients experiencing these symptoms should not be treated differently for EMTALA purposes based on whether or not they are carrying a viable fetus.[10]  For example, a Connecticut hospital was cited by the Office of the Inspector General for delaying care to a woman experiencing contractions 28 weeks into her pregnancy.[11]  After she told them her membranes had ruptured and she was experiencing severe lower back pain, the hospital waited two hours to transfer her to another hospital while she continued to experience active contractions, an unacceptable delay in care.[12]  In another instance, a California hospital was cited in 2019 for failing to screen and stabilize a patient who had come in at 25 weeks pregnant with abdominal pain, discharge, and bleeding.[13]  Without even examining her, the hospital told the patient to go to another hospital in her own car.[14]  On the way, she gave birth to a baby who was not breathing and could not be resuscitated by the time she arrived to the second hospital 26 minutes later.[15]  Such

---

[10] *See Morin v. E. Maine Med. Ctr.*, 780 F. Supp. 2d 84, 96 (D. Me. 2010) (rejecting the "disquieting notion that EMTALA and its regulations authorize hospital emergency rooms to treat women who do not deliver a live infant differently than women who do . . . [It] is not justified by the language of the statute or its implementing regulations," and holding "[t]here is simply no suggestion that Congress ever intended such a harsh and callous result for women who . . . are carrying a non-viable fetus").

[11] *Civil Monetary Penalties and Affirmative Exclusions*, *supra,* note 7.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

unwarranted delays in emergency medical care unquestionably amount to violations of EMTALA.

## II. The Rule Prevents Hospitals from Providing the Care EMTALA Requires.

Recognizing the necessity of providing emergency treatment to any patient suffering a medical crisis regardless of the condition, EMTALA does not permit a refusal to provide emergency medical care on the basis of religious or moral objections.[16]  The Rule, however, permits just such refusals.  The Rule subjects a provider to liability for failing to accommodate an individual provider's objection to providing medical care.

Specifically, as proposed, the Rule would allow an individual provider to deny emergency medical care to a pregnant woman in need of an abortion.  For example, as Plaintiffs point out, the Rule "permits a physician or nurse to withhold emergency stabilizing treatment, or another staff member to refuse to summon the on-call OB-GYN or arrange a patient's transfer to another hospital."[17]  While another physician on staff could, hypothetically, provide such care, "[a] hospital would effectively have to double-staff to ensure it could provide emergency care,

---

[16] *See e.g., Matter of Baby K*, 16 F.3d 590, 597 (4th Cir. 1994) ("EMTALA does not provide an exception for stabilizing treatment physicians may deem medically or ethically inappropriate.").

[17] Br. for Plaintiffs at 47 (citations omitted).

which is untenable."[18]  Even if such double-staffing were possible, "a person experiencing a life-threatening emergency often cannot wait to be treated by another provider."[19]  Acknowledging these possibilities, the District Court concluded that the Rule would "handicap the employer's ability to respond to emergencies and comply with EMTALA."[20]  Accordingly, the Rule prevents hospitals from delivering the lifesaving care that EMTALA requires.

## III. Patients Have Suffered Harm from EMTALA Violations, Including Due to Religious Refusals of Care.

Citing no authority apart from HHS's own representation, Defendants-Appellants argue that there is no conflict between EMTALA and the Rule because such a conflict is a "hypothetical situation not known ever to have occurred."[21]  But providers have refused to treat patients in emergency situations, such as when miscarriages or other complications of pregnancy occur or a patient needs an emergency abortion, on the basis of religious-based objections with tragic consequences.  In such circumstances, patients suffer severe physical and psychological trauma.  The following examples illustrate the trauma patients may suffer when doctors or hospitals refuse to provide standard-of-care information or

---

[18] *Id.*

[19] *Id.*

[20] *New York v. United States Dep't of Health and Human Servs.*, 414 F. Supp. 3d 475, 560 (S.D.N.Y. 2019).

[21] Br. for Appellants at 40–42.

7

treatment consistent with EMTALA's requirements, a scenario that would become more common under the Rule.

## A.    Rachael Lorenzo[22]

In the fall of 2013, Rachael Lorenzo learned they[23] were pregnant.  Six weeks into the pregnancy, Rachael received an ultrasound and learned that the fetus was showing no growth or cardiac activity.  The doctor advised Rachael that their body would expel the fetus on its own within a few weeks.  The doctor also informed Rachael that they might experience back pain and bleeding as a result, and that if the bleeding became severe or they could not stand, they should go to the emergency room.  No one advised Rachael of alternative options available to them or the risks they faced by not seeking additional treatment.  Eventually, Rachael reached a point where they could not stand up straight, were bleeding severely, and began to experience contractions, so they went to the nearest and most preferable hospital in Albuquerque, New Mexico that took their insurance to seek treatment.

Once Rachael arrived at the hospital with their husband and one-year-old daughter, they were given a triage bed in the emergency room and pain medication.

---

[22] *See generally Rachael's Life Hung in the Balance Because of Someone Else's Religious Beliefs*, ACLU New Mexico (Oct. 1, 2019), https://www.aclu-nm.org/en/news/rachaels-life-hung-balance-because-someone-elses-religious-beliefs.

[23] Rachael uses "they," "them," and "their" pronouns.

They began to feel the urge to push and lay in the bed bleeding and pushing, but no doctor came to see them.  The pain and bleeding increased and became so bad that Rachael began to experience dizziness and blurry vision.  So much time passed that Rachael's husband had to leave to take their one-year-old daughter to a family member's house for care.  In the time it took Rachael's husband to drive their daughter across town and return to the hospital, Rachael remained alone in a blood-soaked bed without receiving additional treatment.  As the pain and other symptoms intensified, the hospital staff refused Rachael's request for additional pain medication.

Hours after arriving at the hospital, still laying in blood-covered sheets and suffering from extreme pain, Rachael finally saw a doctor.  When the doctor examined Rachael, however, he stated, "I know what needs to be done, but I can't do that for you."  The doctor told Rachael that someone else would come help them, but could not tell Rachael when that person would arrive.  Rachael's husband repeatedly tried to call for another doctor, but was denied any assistance.

Rachael continued to lay there in their own blood, with minimal privacy, screaming, and in the most pain they had ever experienced until, finally, another doctor arrived.  That doctor was able to treat Rachael by performing a dilation and curettage ("D&C") to remove tissue that remained in their body and created the risk of infection.  By this time, however, Rachael also needed two blood

transfusions to replace the blood they had lost. The doctor that performed the D&C appeared frustrated by the delay, and asked why she had not been summoned earlier to provide help.

Though Rachael arrived at the hospital in need of emergency care, they were denied that care for hours. This placed Rachael in significant danger, and imposed physical and mental harm on Rachael that has lasted years after they were discharged from the hospital.

After Rachael was sent home, the painful and dehumanizing experience in the hospital continued to impact them. The experience affected Rachael's mental health and they developed an addiction to oxycodone, a pain management medicine provided by the Albuquerque hospital. In addition, Rachael feared getting pregnant again. Rachael did give birth to a son following their traumatic experience at the hospital in Albuquerque, however, the pregnancy was emotionally taxing because of what Rachael had experienced. Due to the toll pregnancy placed on their mental health, at age 25, Rachael underwent a procedure to ensure that they could no longer become pregnant.

## B.    Mindy Swank[24]

In 2009, Mindy Swank learned that she[25] was pregnant with her second

child.  She and her husband had wanted a large family, and they were very excited

about the pregnancy.  Sixteen weeks into Mindy's pregnancy, however, an

ultrasound at her local hospital in Silvis, Illinois, Genesis Medical Center

("Genesis"), revealed that there were complications.  Further testing at a regional

Catholic hospital in Peoria, Illinois, OSF Saint Francis Medical Center ("Saint

Francis"), confirmed a number of fetal abnormalities, including severe

hydrocephalus and a malformed heart.  Wanting what was best for her pregnancy,

Mindy made appointments with a pediatric neurosurgeon and a pediatric

cardiologist.

When Mindy returned to Saint Francis for further testing 20 weeks into her

pregnancy, she learned that her water had broken, depleting her amniotic fluid, and

that she had two options:  (1) she could terminate her pregnancy immediately, or

(2) she could wait a couple of weeks, at which point she would risk getting an

infection and may need an abortion to save her life.  The treating physician told her

---

[24] *See generally* Julia Kaye, Brigitte Amiri, Louise Melling & Jennifer Dalven, *Health Care Denied, Patients and Physicians Speak Out About Catholic Hospitals and the Threat to Women's Health and Lives* 8–9 (May 2016), https://www.aclu.org/sites/default/files/field_document/healthcaredenied.pdf; Full Frontal with Samantha Bee, *Extended Interview: Mindy Swank*, YouTube (Oct. 27, 2016), https://www.youtube.com/watch?time_continue=19&v=9finqZJJNA8.
[25] Mindy uses "she," "her," and "hers" pronouns.

that if she was able to carry the pregnancy to term, the baby would most likely die soon after birth, and that if he did not, he would never gain consciousness due to his severe brain damage.  Heartbroken over the inevitable loss of her baby, Mindy decided that terminating her pregnancy as soon as possible was the safest option. Above all, she wanted to avoid prolonging her baby's suffering following birth.

Even though they had informed her that an abortion would ultimately be necessary to save her life, the doctors at Saint Francis refused to terminate her pregnancy because the hospital adhered to religious directives, which prohibit abortions.[26]  Instead, the Catholic hospital sent Mindy to the University of Iowa Hospital ("University of Iowa") in Iowa City, Iowa, where she was unable to receive treatment because Saint Francis had failed to forward Mindy's medical records.[27]

Shortly after being denied the care she sought for a second time, Mindy started bleeding and sought treatment at Genesis to terminate the pregnancy.

---

[26] *See* Directive 45, U.S. Conf. of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care*, 18–19 (June 2018), https://www.usccb.org/about/doctrine/ethical-and-religious-directives/upload/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06.pdf ("Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted.").

[27] *See id*. ("Catholic health care institutions are not to provide abortion services, even based upon the principle of material cooperation.  In this context, Catholic health care institutions need to be concerned about the danger of scandal in any association with abortion providers.").

12

Mindy did not know at the time that Genesis also adhered to religious directives. Physicians at Genesis refused to perform an emergency abortion and sent her home, purportedly because she was not bleeding enough or running a fever. Over the next five weeks, Mindy sought and was denied treatment several more times. In addition to refusing care, no one at Genesis offered to refer her to a provider that could perform an abortion. Nor did they present her with any options other than waiting until her pregnancy imminently threatened her life.

Around 22 weeks into her pregnancy, Mindy experienced severe pain in her uterus. Testing at Genesis revealed that her white blood cell count was elevated, indicating a possible infection. She was admitted to Genesis, where she remained for five days while a doctor tried to induce labor. When Mindy's white blood cell count decreased, Genesis stopped inducing and sent her home with antibiotics— despite the fact that the fetus had almost no chance of survival and terminating the pregnancy was essential to Mindy's safety.

Finally, at 27 weeks pregnant, Mindy woke up severely hemorrhaging and again sought emergency treatment at Genesis. To prove how much she was bleeding, she gave hospital staff her soaked pads. Instead of immediately admitting her for treatment, Genesis weighed the bloody pads and compared them to unused ones. Several hours later, doctors at Genesis were finally convinced that she was bleeding enough to justify terminating the pregnancy, which they had

13

known for weeks was almost certainly not viable. It was not until this late stage that the doctor treating Mindy informed her that the termination could threaten her life, result in the loss of her uterus, or make it difficult to have children in the future.

After taking contraction-inducing medication, Mindy gave birth to an unconscious baby boy who struggled to breathe for three hours before dying in her arms. The placenta came out in pieces, and the doctor performed an excruciatingly painful D&C without any anesthetic. Following this agonizing experience, Mindy suffered from a deep depression and was subsequently diagnosed with post-traumatic stress disorder, from which she still suffers.

Even though Saint Francis and Genesis knew that Mindy's pregnancy was not viable and would ultimately put her life in danger if not terminated, doctors delayed the emergency care she needed. Not only did this risk the loss of Mindy's ability to have children in the future and lead to the prolonged suffering of her baby after birth, but it also put her life in jeopardy and resulted in lasting emotional trauma.

### C.    Meghan Eagen[28]

In 2004, Meghan Eagen was approximately seven weeks pregnant and working as a labor and delivery nurse at Providence Hospital in Everett, Washington ("Providence"). When she[29] began to experience severe miscarriage symptoms, Meghan sought treatment at Providence because it was the only hospital nearby that accepted her medical insurance.

When Meghan arrived at the emergency room, she was hemorrhaging severely and an ultrasound did not detect any embryonic cardiac motion. At that time, her human chorionic gonadotropin ("hCG") level—the hormone made by cells formed in the placenta and used to detect pregnancy—was 4500, nearly three times the widely accepted level of 1600 at which fetal cardiac motion, and therefore ongoing pregnancy, can be detected.

These facts, combined with her bleeding, established with certainty that Meghan was having an incomplete miscarriage. For Meghan, her incomplete miscarriage left products of conception in her uterus when the pregnancy was no longer viable. When this happened, she needed the contents of her uterus aspirated to safely remove the remaining tissue in order to stop the bleeding.

---

[28] *See generally* Amy Littlefield, *A Miscarrying Woman Nearly Died After a Catholic Hospital Sent Her Home Three Times*, Rewire News (Sept. 25, 2019), https://rewire.news/article/2019/09/25/miscarriage-catholic-hospital/.
[29] Meghan uses "she," "her," and "hers" pronouns.

Instead of allowing immediate treatment of Meghan's hemorrhaging, the religious directives to which Providence adhered mandated that her providers wait and check repeatedly for a fetal heartbeat, even where all medical indicators showed that her fetus was not viable and that Meghan's health was at risk. They also prohibited emptying the uterus if there was an embryonic heartbeat. Because Meghan worked at Providence in the labor and delivery ward, she knew that medical personnel risked being penalized—and possibly losing their admitting privileges—if they provided an aspiration to protect her health.

Bound by the religious directives, the providers continued to confirm and reconfirm the lack of cardiac activity while Meghan lay bleeding for six hours. Meghan lost so much blood during the unwarranted delay that she needed a blood transfusion. This transfusion resulted in severe health consequences that were particularly problematic during Meghan's next pregnancy.

Specifically, all blood is either positive or negative for a blood antigen called Kell. Most people, like Meghan, are Kell negative. When Meghan received her transfusion, her donor was Kell positive. This transfusion left Meghan dangerously sensitized to Kell and her next pregnancy was a "Kell pregnancy," in which her body saw the fetus as foreign and tried to attack it. This created a high-risk scenario for both Meghan and her fetus. Meghan and her daughter survived, however, this risk could have been avoided had Meghan received the necessary

16

aspiration early enough during her prior pregnancy, negating the need for a transfusion.

In addition to physical complications, Meghan suffered emotional trauma. Meghan doubted the viability of her next pregnancy and became emotionally detached from her unborn child. That pregnancy was a source of well-founded stress, not joy.

In Meghan's case, there is no debate about what the providers should have done when she suffered an incomplete miscarriage. As a trained medical professional, Meghan knew this, and her providers knew this, but hospital policies prevented the pursuit of the safest option. Meghan's experience exposes how the Rule's allowance for religious-based refusals would inherently put patients with clear medical emergencies at risk.

## IV. Refusals of Health Care Are Not New, but the Rule Would Make Them Widespread, Disproportionately Affecting Women of Color

The conflict between EMTALA and the Rule, which would permit religious-based objections, is not hypothetical or remote because refusals of health care based on religious directives create dangerous realities, as illustrated by the experiences of Rachael, Mindy, and Meghan. Further, patients, like Mindy, are often unaware that the hospitals at which they seek care may invoke religious directives to limit reproductive care. Hospitals often do not disclose to their patients when they are invoking religious directives, nor do they explain to patients

how the hospitals' religious affiliation may affect their treatment.[30]

Even in situations where patients are aware of a hospital's restrictions, the Rule may lead to those patients not having any other option for treatment. For example, in an emergency, patients may have to go to the closest hospital, regardless of whether that hospital operates under religious directives.[31] Some communities may only have access to hospitals that will try to invoke religious directives to refuse care, leaving patients with no alternatives,[32] or insurance coverage might impact a patients' ability to choose a hospital. In addition, some hospitals may invoke religious directives and refuse to refer patients to another hospital or to transfer their medical records, making it difficult to seek care from another provider.[33] Further, under the Rule, hospitals may not know whether an individual care provider objects to providing emergency reproductive care, leaving patients even more in the dark.

The Rule would increase EMTALA violations because it would empower more providers to invoke religious directives to delay treatment at the cost of

---

[30] *See* Kira Shepherd et al., *Bearing Faith: The Limits of Catholic Health Care for Women of Color* 24 (Jan. 2018), https://lawrightsreligion.law.columbia.edu/sites/default/files/content/BearingFaith.pdf.

[31] *Id.*

[32] *Id.* at 24–25.

[33] *Id.* at 25.

patient safety.  For example, religious directives may lead providers to delay care by performing repeated "unnecessary testing" to evaluate whether there is a detectable fetal heartbeat (in which case the termination of the pregnancy is generally prohibited), sometimes until a woman's "health, safety, and future fertility is jeopardized."[34]  When leadership in hospitals that adhere to religious directives will not approve a medically necessary abortion, patients may "receive treatment that is riskier and less comfortable."[35]  Delaying treatment until a condition becomes a life-threatening emergency is never a medically sound option.[36]  Because the Rule conflicts with EMTALA by authorizing the withholding of emergency stabilizing treatment, it would multiply the risks to patients subject care pursuant to religious directives

Further, women of color would be most at risk under the Rule because they are already more likely to give birth at hospitals governed by religious directives. This is problematic because the Rule would embolden these hospitals to invoke

---

[34] *Id.* at 23 (citing Lori R. Freedman, Uta Landy, & Jody Steinauer, *When There's a Heartbeat: Miscarriage Management in Catholic-Owned Hospitals*, 98 Am. J. of Pub. Health 1774 (2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2636458/ ("Catholic-owned hospital ethics committees denied approval of uterine evacuation while fetal heart tones were still present, forcing physicians to delay care or transport miscarrying patients.")).

[35] Freedman, et al., *supra* note 34, at 1778.

[36] *See generally* Kaye et al., *supra* note 24, at 12.

such directives to deny care.  One study found that 53% of births at Catholic hospitals are to women of color.[37]  In addition, in nineteen of the thirty-three states and one territory studied, a disparity existed at the state-level.[38]  This fact exacerbates existing racial disparities in health care, and reproductive health care in particular.[39]  Women of color are more likely to be uninsured, and as a result may receive no prenatal care or inadequate prenatal care.[40]  In addition, "women of color experience lower quality health care and face poorer health outcomes than white women."[41]  These disparities can contribute to pregnancy complications, including miscarriage.[42]  According to the Centers for Disease Control and Prevention ("CDC"), "Black, American Indian, and Alaska Native (AI/AN) women are two to three times more likely to die from pregnancy-related causes than white women – and this disparity increases with age."[43]  The Rule would further aggravate such disparities because of the disproportionate impact that religious-based refusals already have on women of color.

---

[37] Shepherd et al., *supra* note 30, at 12–13.

[38] *Id.* at 13.

[39] *Id.* at 12–13.

[40] *Id.* at 34.

[41] *Id.*

[42] *Id.*

[43] *Racial and Ethnic Disparities Continue in Pregnancy-Related Deaths,* Centers for Disease Control and Prevention (Sept. 6, 2019) https://www.cdc.gov/media/releases/2019/p0905-racial-ethnic-disparities-pregnancy-deaths.html (last accessed August 3, 2020).

## CONCLUSION

For the reasons stated above, the Court should reject Defendant-Appellants' and Defendants-Intervenors' false assertion that refusals or delays in essential care do not result from religious-based objections. Unequivocally, the Rule would increase opportunities for providers to refuse to provide emergency, life-saving treatment. The traumatic situations that the amici experienced as a result of refusals of care are not hypothetical or nonexistent—they are a reality that has jeopardized the health and lives of patients, predominately women of color. Defendants-Appellants' assertion to the contrary is not only unsupported, it belittles and marginalizes the experiences and trauma of the people who have endured such denials of critical care.

Dated: August 3, 2020

/s/ Pamela A. Miller
Pamela A. Miller

PAMELA A. MILLER
MIA N. GONZALEZ
CATHERINE D. NAGLE
FRANCES A. ZIESING
LAURA K. KAUFMANN
O'MELVENY & MYERS LLP
Times Square Tower
Seven Times Square
New York, New York 10036
(212) 326-2000

*Counsel for Amici Curiae*

21

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 4482 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  August 3, 2020                  /s/ Pamela A. Miller
                                        Pamela A. Miller

                                        PAMELA A. MILLER
                                        MIA N. GONZALEZ
                                        CATHERINE D. NAGLE
                                        FRANCES A. ZIESING
                                        LAURA K. KAUFMANN
                                        O'MELVENY & MYERS LLP
                                        Times Square Tower
                                        Seven Times Square
                                        New York, New York 10036
                                        (212) 326-2000

                                        *Counsel for Amici Curiae*

22